Good morning. Good morning, Your Honor. May it please the Court, my name is Bruce Ewing with the firm of Dorsey & Whitney, here today representing the appellant Bells Brewery. When this Court's predecessor decided the controlling DuPont case in 1973, it set forth a 13-factor framework in which the likelihood of confusion could be assessed between two trademarks for registration purposes. The decision of the Trademark Trial and Appeal Board in this case, for which this appeal is taken, was not premised on those 13 factors. It wasn't premised on a group of those factors. It wasn't premised on one of those factors. It was premised… Why do you say that? I say that because it was premised on one part of one factor, which was the DuPont factor concerned with similarity, but not all the different aspects of similarity. What makes you conclude that the Board didn't consider all relevant factors? It considered the factors, but what it said in its decision was, at the end of the day, what it concluded was that because in its mind, Bells, the mark used by Bells Brewery, and Bell Hill, the mark used by the appellee, Bell Hill Vineyards, meant different things to consumers, that that difference in meaning was so vast that it trumped the visual and oral similarities between the marks and all of the other DuPont factors. Well, that reflects its conclusion based on its review of the relevant factors. That doesn't mean that it overlooked or disregarded or didn't apply any of those factors. There's nothing that suggests to me, anyway, that they didn't consider all of them. They considered the factors, but they ultimately found that one part of one factor predominated over everything else. Why isn't that substantial evidence to support their conclusion? Well, there is no case, any time, this Court or the Board, in which one part of one factor has taken on such a dominant role in the analysis. It was also incorrect as a matter of fact. Bells and Bell Hill are not sufficiently different, not sufficiently dissimilar to allow that factor to drive the entire analysis and to essentially say that the other DuPont factors Yeah, but that's a question of fact, that we're sort of limited in what we can do with it. Aren't we under our standard of review? Not really, because what this Court has said in many other cases is that when you have marks that have obvious visual and oral similarities, for example, laser versus laser swing in the Cunningham case, Veuve Clicquot versus Veuve Royale in the Palm Bay Imports case, West Point Pepperell, what the Court has said in those decisions is that when you have marks with visual and oral similarities, to allow perceived dissimilarities in meaning to trump that factor, let alone override all the other factors in the DuPont analysis, is incorrect. And here I would argue that the dissimilarities in meaning that the Board identified are illusory. Both marks have Bell in them. And what the Board found was that, well, Bell's, in my client's mark, is a person's name, or perhaps a musical instrument, and that Bell Hill is a geographic location. I would submit to you that a person's name and a geographic location are hardly mutually exclusive. For example, we're standing in a building that's located on Madison Place, a building that has a name, whose name originated with a former president, and is now literally a geographic location. Lafayette Park is right across the street. So that's one problem with the Board's analysis. Another problem with the Board's analysis is its presumption that all consumers, without any evidence in the record, are going to go through this process of ascribing meanings to these marks. What is far more likely, I submit to you, is that consumers who know Bell's beer and who've bought Bell's beer and who like Bell's beer are going to see a Bell's beer sitting on a shelf and say, that's my beer. That's the beer I like. They're not going to be thinking about, hmm, is this someone's name? Is this a musical instrument? They're going to understand Bell's as a brand. And when they see Bell Hill sitting on a shelf, not far away or perhaps directly adjacent to it, they're going to think, oh, Bell's has gone into the wine business. Bell's has come out and is now selling wine. Well, I mean, you're kind of testifying here, giving us evidence about what consumers would think or not think. Did you put on any evidence in the record as to how consumers would perceive that distinction? No one offered any evidence, either side, in the proceeding below as to what the marks meant to consumers. So what are we supposed to make of your coming up here in oral argument and kind of testifying about what consumers would think or not think in a particular situation? The board's perception is based on what it derived from its head, what it simply thought people would think if they saw a particular mark. That's why there's no substantial evidence for that aspect of the board's conclusion. There's nothing in the record to support it at all. What we do know in the record, based on the way the marks appear, is that they have obvious visual and oral similarities. They both have Bell in them. This court has held repeatedly that when you have marks that have a common beginning term, that that is a dominant factor in the mark, that that weighs in favor of a finding of similarity. In fact, in this case, the board acknowledged that the marks did have a common first element, that that was dominant in the Bell's mark, and that what it found instead, though, was, well, that's all true and we know that there are these cases, but we think, based on our own say-so, that these marks are going to mean different things to consumers, and that drove their decision. Well, I may be confused, which easily happens, but I thought the burden was on you. You were challenging their registration. Didn't that put the burden on you to produce the evidence that you say there is none of? We produced evidence showing that the marks were visually similar and orally similar, and that should have guided the analysis. I thought a minute ago you said there was no, nobody brought in any evidence of anything. We are not obliged to submit evidence on every single aspect of the similarity analysis, only enough to show that the overall factor should weigh in our client's favor. And in this case, given the way the marks look, given the way they sound, based on this court's prior precedence, that should have resulted in that factor tilting in favor of our client. But you can't argue evidence that you didn't present. But the issue, though, is that, to turn it around, there is no substantial evidence for the Board's conclusion. What is there in this record that shows that consumers are going to exclusively think that Bell is... Their conclusion was that you didn't establish likelihood of confusion. Wasn't that their conclusion? Overall, yes. That is what they found. And it was your burden. It was our burden. And you put in no evidence on that. We put in ample evidence on all of the DuPont factors, just not on this one small subpart. What the Board found was they seized on that subpart, conceived in their own minds what consumers will think when they encounter these marks, and then said, we know there's evidence on these other DuPont factors, and some of them they did find favored us. But what they found was that at the end of the day, that didn't matter. And they issued the decision below for which this appeal was taken. So with respect to the other DuPont factors, the factor concerned with the strength of the mark, for example, there was evidence in this record that showed that in fact Bell's has been very successful. It has achieved tens of millions of dollars in sales over a period of time, that the mark has received unsolicited media coverage that's been very favorable, that it's highly regarded and successful. The Board acknowledged all of this. They acknowledged that Bell's has acquired a, quote, devoted following, unquote. And then what did they decide? It's not entirely clear from the decision. They didn't say that Bell's was weak, but they didn't really characterize it as strong either. It's just not clear from this decision what the rationale for the Board's holding was, having found correctly that Bell's has been used for a long time, 25 years, has tens of millions of dollars in sales success. Can I ask you a question outside of the record, which is just in reference to the briefs referred, I think, to the fact that you had a pending application in 2007 for Bell's Wine. Am I wrong by recalling that? What's the status of that application? It's still pending. It was approved by the trademark office, and it's still pending. To come back to the issue of the strength of the mark, this Court in its Bose v. QSC audio case found that the marks at issue there, which were Wave and Power Wave, were famous marks based on evidence that was very similar to what was submitted here. Those marks had been used for several decades. Those marks had achieved a great deal of notoriety and success in the marketplace. The sales figures in that decision were higher than those here, but we are only arguing that the Bell's mark is strong, not that it's famous, just that it's strong, and that's all that's needed for purposes of this analysis, and it should have favored Bell's. Another factor that should have favored Bell's, although it's not entirely clear what conclusion the Board reached on this point, was the relatedness of the goods. This Court has held repeatedly on various occasions that alcoholic beverages are to be deemed related for purposes of the DuPont analysis, and in fact, this Court, the Board, acknowledged those holdings in the decision below, and instead what it did, though, was it said that, well, beer and wine are somewhat related, but in this case, that factor doesn't favor Bell's because there's no evidence that it was a, quote, common practice, unquote, for third parties to be selling beer and wine under the same marks. There is no authority for superimposing that requirement in the analysis of relatedness. There's no case that stands for that proposition, and there is evidence in this record that, in fact, third parties are selling beer and wine under the same or similar marks, including Bell's, which is itself a winery, it has been a winery since 2003, and is selling beer and wine together. Mr. Ewing, any final point before you reserve your rebuttal time? What the Board did in this case was essentially say that the rest of the DuPont factors are superfluous when one subfactor is ways in favor of the applicant. If the Board were to affirm that framework on appeal, then what you're essentially saying to the Board is, when you find that two marks mean different things in your minds, then you don't have to consider anything else, and that's not supported by any authority that this Court has ever issued. I'll reserve the rest of my time. Thank you. Thank you very much. Mr. Olson? Good morning. Good morning, Your Honor. May it please the Court. My name is Philip Olson, and my partner, Gary Bays, is with me, and Philip Maxwell, who's I think that the one thing that we agree on this morning is that the DuPont criteria are the tabula rasa, or perhaps the tabula dupont, of this case, and we need to parse them. But I disagree very strongly with the opposer in this regard. If we look at what the Board did below, we see that they did look at each of the... There are five DuPont criteria that are particularly relevant here, and they are one through five. And then the conclusion as to confusion is the twelfth criteria. As to the first one, it is the similarity or dissimilarity of the marks in their entirety as to appearance, sound, connotation, or commercial impression. So that's in their entirety. What the Board had before them was a mark, and you'll see it at page two of the decision, and the mark has ringing bells, looks a little like a holiday decoration. And bell, the syllable sounds the same, but then they had evidence as to the connotation and commercial impression, and they learned, they knew from the applicant's record that Bell Hill was the name of a street near its winery, and they had picked this as their brand name and trademark, and that evidence was in the record. And they found, and I think there was nothing to dispute, that one would not think of Bell Hill as a place. I mean, this is common sense. I mean, it's... If you think of Lowell Street or Pennsylvania Avenue, they're a place. And they found that that was the connotation and commercial impression. They then went to the second... How are we supposed to assess whether or not that's common sense or not? I mean, it's not Bell Street. It's not... I mean, it's a little different than your normal geographic kind of connotations. I mean, Hill is not street, it's not avenue, it's not lane. So how do we... But it's not... All right, and that's a fair point, because it's not the... If it were Bell Hill Street or Bell Hill Road, then the road would drop, would be subordinate. But here, Bell Hill comes in as bringing up a place name, and the board found that it was no evidence the contrary. There were no survey, no expert who came in and said, oh, people won't think of this as a place. They'll think of it as related to Mr. Bell or his brewery or ringing bells. So there was no evidence to the contrary. But where do they get... I mean, but somebody had to come up with this predicate, which is when you use the term hill in connection with the name, it confers a geographic designation. Where does that come from? Well, I mean, as I said, Hill is a little different than lane or street, which I think one could have some basis for doing that. Where does that come from? I think it comes... If you look at the cases where there has been exclusion, giant case, giant means giant. It's the same word with the same meaning. I think that in this case, there is obviously a different meaning as to Bell's apostrophe or to Bell Hill. Now, was there an expert who said, oh, this isn't... This is different? No. No. But it was their duty to offer that opposition. Well, what I'm asking for is if there was some expert at the get-go saying, this is how it should be interpreted, affirmatively. I think only the reviewer who asked about this name, where the name came from, it was an argument whether it was a geographic place, in which case there would be different treatment. And there was a conclusion that it was not in the directory of geographic names in the place. Really, there was nothing that was offered to the contrary. It's just in the common parlance of the English language. It wasn't as if they were saying Bell's Hill even. It was just Bell Hill that was taken. I can only say that they looked at it and with the evidence that was before them, concluded that it was a place. And so they addressed the four prongs of the first criterion. Then, as Mr. Ewing points out, they went to the second standard, the similarity or nature of the goods and services. And they found, in that regard, that beer and wine were somewhat related, but that it was not a common practice for them to emanate from the same source. Now, the evidence that was offered below there was that Bell's Brewery sells honey wine, mead, and apple wine, cider, at its eccentric café in Kalamazoo, Michigan. I understand that there was the offer of another winery or brewery in Michigan, a small place that had wine and beer. And on the basis of that evidence, the board quite reasonably said there was evidence that this might occur, but it was not a common practice. So that was the second prong. The third prong was, might these trade in the same channels? And the answer was, yes, beer and wine go through the same distributors in the same stores. And do they go to the same consumers? And the board found that, yes, they did. And then it got to the fifth criterion, the strength of the mark. And there, the criterion is the fame of the prior mark in terms of sales advertising and length of use. And the board found that the mark was not famous, and if you look at the reply brief of the appellant, they conclude, they conceive that it is not a famous mark. So the board then addressed the criterion in the first prong. I've got too many prongs here. The first test and the four prongs of it, and they did address it. And they said there was a similarity of the syllable. They noted that the graphics were distinctive and were like a ringing bell. They imply that at least. And then they found that the connotation and the commercial impression were different. They went, they said there was a little bit of substance, there was a little bit of commonality in the second, that the third and fourth went for the opposer, and then that the fifth, there was no fame. And from that, on the basis of those factual findings, they found that there was not a likelihood of confusion. And I think that that was a reasonable conclusion on their part. Any questions? No questions. Thank you. All right. Mr. Olson, thank you very much. Mr. Ewing, you have a few minutes for rebuttal. Thank you, Your Honor. With respect to the issue of the relatedness of the goods, I would refer the Court to its decision in Majestic Brewing, where it considered the impact of evidence that third parties were using the same or similar marks on related goods. And it found that evidence was relevant, if it existed, but it wasn't dispositive. And in fact, the Board here suggested in its decision that it was. With respect to the analysis of strength, I do have to disagree strongly with Mr. Olson on one point. This is not a dilution claim, in which fame is a prerequisite. If you can't show your marks famous, you have no dilution claim. Strength of the mark is all that's necessary, and in fact, this Court's prior decisions talk about how a strong mark casts a long shadow. Granted, a famous mark would cast a somewhat longer shadow, but a strong mark casts a long shadow. That factor should have favored Bells in the analysis of likely confusion. Let me be sure I understand the heart of your case. Is it your argument that the Board cannot make a decision based on one single DuPont factor being dispositive? No, that is not our argument, because in fact, this Court has said in several other decisions that one DuPont factor can be dispositive. I'm glad you noticed that. In a handful of cases. What I am saying is that one sub-part of one factor in and of itself should not be dispositive, and I would refer the Court to two cases in which that was specifically addressed. They're both cited in our brief. The TBC Corporation v. Hulsa, that's the Grand Slam, Grand Am case. The Board there found, hey, these marks are different, and the Court reversed and said, no, they're not. They look visually and orally similar, notwithstanding that they mean different things. And I would also refer the Court to the Kimberly-Clark v. H. Douglas Enterprises case. That's the Huggies-Duggies case, and there the Court found that, you know, these two marks, you know, granted, Huggies and Duggies mean different things, if either of them means anything at all, but in fact, their visual and oral similarities were paramount, and the Board should not have given excessive weight to whatever dissimilarities in meaning it identified. So this Court has actually, on multiple occasions, said that you shouldn't elevate whatever the Board thinks in its own mind about differences in the meaning of particular marks and allow that to be essentially the be-all and the end-all of the analysis. That's a legal error that the Board made, in addition to a factual error. Thank you, Your Honor. Thank you very much. I thank both counsel. The case is submitted, and that concludes our arguments this morning.